IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEHIGH RIVERPORT REALTY, L.P.,

        Plaintiff,

  v.                                     CIVIL ACTION
                                             NO. 15-3179

UNITY BANK,

        Defendant.

## **MEMORANDUM**

**SCHMEHL, J.** /s/ JLS                                                           June 8, 2016

      Plaintiff owned a group of commercial condo units, and Defendant was the lender on a first mortgage on those units. Plaintiff became delinquent in its payments. Plaintiff alleges that after two forbearance agreements, Defendant promised to continue to work on a resolution if Plaintiff would not contest foreclosure. After Defendant took a default judgment in the foreclosure action, Plaintiff alleges it negotiated a purchase and additional lease deal with one of its tenants that could have resolved the debt to Defendant; however, Defendant did not agree to continuance of the sheriff's sale, did not cooperate with financing to enable the deal, and allegedly made disparaging comments to the tenant about Plaintiff in order to sour their relationship. Plaintiff brings claims for tortious interference with both the existing lease and the potential purchase/lease deal, as well as for fraud.

Factual and Procedural Background

Plaintiff Lehigh Riverport Realty, LP, owns commercial real estate, in particular several related condominium units in Bethlehem, Pennsylvania. Beginning August 25, 2004, Plaintiff leased units 40 and 50 to Starter's Realty, LLC. Starting January 5, 2005, Plaintiff leased units 20 and 30 to Steel Fitness. In December 2006, Plaintiff received financing for those four units from Defendant Unity Bank, secured by a first mortgage. In December 2009, Plaintiff obtained further financing from Franklin Financial, secured by a second mortgage on those same condo units.

In December 2011, Starter's breached its lease. Plaintiff initially accepted partial payments, but by August 2012, Starter's stopped paying altogether. Without that income, Plaintiff in turn defaulted on its loans with Defendant and Franklin Financial. Plaintiff and Defendant entered into two forbearance agreements: one beginning February 28, 2013, and ending December 2, 2013; another picking up from the first and extending to December 28, 2014. Plaintiff did not keep up with payment of taxes, condo fees, or the debt itself under the forbearance agreements and was in default by July 28, 2014. Defendant filed a foreclosure action on September 8, 2014.

According to Plaintiff, during this period, Defendant represented that it "would continue to 'work with' [Plaintiff] in effort to procure a new user for the space and establish and execute an acceptable 'work out' plan so long as [Plaintiff] did not challenge the foreclosure and kept [Defendant] informed of all activities associated with the attempt to re-let the units." Plaintiff did not challenge the foreclosure, which ended with a default judgment being entered on November 18, 2014.

Plaintiff alleges that on January 19, 2015, it reached a verbal agreement with Steel Fitness to purchase the two units it was leasing and additionally lease the other two units previously occupied by Starter's, "at a lease rate and under such other terms [and] conditions that made it financeable in the commercial mortgage market with the cooperation of Franklin." Plaintiff says the deal would have made it able to cover its debt to Defendant. Plaintiff alleges that Defendant then became interested in providing the necessary financing to Steel Fitness itself rather than involving Franklin.

Plaintiff claims Defendant thereafter began to indicate, including in state court proceedings, that it would not be financing the deal and that it did not agree to continuance of the sheriff's sale of the foreclosed property, although the sale was in fact repeatedly continued. The complaint also states that Defendant then told Steel Fitness it would have to wait until the stay expired, which Plaintiff takes as an indication that Defendant was willing to provide financing, but only after acquiring the property itself rather than letting Plaintiff keep the property and resolve the debt. Plaintiff alleges that Defendant further frustrated any deal between Steel Fitness and Plaintiff by referring to Plaintiff's principal, Louis Pektor, as a "bum" and stating, ". . . screw Pektor, you don't want to do business with him . . . ."

Plaintiff filed the present case on May 20, 2015, in Northampton County. On June 5, 2015, Defendant removed to this Court on grounds of diversity, and promptly filed a Motion to Dismiss. The Court held one in-person and two telephone conferences through the fall of 2015, during which counsel for both parties continued to indicate to the Court that a deal, with various permutations but apparently still involving a sale to Steel Fitness, was being worked out and would resolve this suit. Eventually the parties

reported that the matter would not be resolved, and the Court held oral argument on the motion on February 11, 2016.

Discussion

The parties have gone down several long paths of argument that tend to confuse the straightforward issues. For instance, Defendant discusses at length and with many side notes the idea that its foreclosure cannot constitute improper interference because it had every right to foreclose, while ignoring the fact that Plaintiff also alleges interference in the form of disparaging remarks to Steel Fitness. On the other hand, Plaintiff mixes allegations between claims in an effort to cover gaps in each. The following analysis simply addresses the allegations and elements of each claim in turn.

### Count I: Tortious Interference with Contractual Relationship

The tortious interference with contract claim expressly identifies the contract at issue as the existing lease between Plaintiff and Steel Fitness for units 20 and 30. The complaint also identifies the interference at issue as Defendant's president disparaging Plaintiff's principal to dissuade Steel Fitness from conducting business with Plaintiff.

To make out a claim of tortious interference under Pennsylvania law, a plaintiff must show:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of

4

> privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *CGB Occupational Therapy, Inc. v. RHA Health Serv. Inc.*, 357 F.3d 375, 384 (3d Cir.2004); *See also Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979).

*Bral Corp. v. Johnstown Am. Corp.*, 919 F. Supp. 2d 599, 612 (W.D. Pa. 2013).

In analyzing tortious interference, Pennsylvania courts look to the Restatement, *see Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. Ct. 2013), which defines the wrong at issue as interference "with the *performance* of a contract . . . between another and a third person by inducing or otherwise causing the *third person not to perform* the contract," Restatement (Second) of Torts § 766 (1979) (emphasis added). In interpreting the prior version of § 766, which also referred to causing a third person not to perform a contract, the Pennsylvania Supreme Court noted that a defendant "must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result." *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1182 (Pa. 1978) (quoting *Birl v. Philadelphia Elec. Co.*, 167 A.2d 472, 474 (Pa. 1960)).

There is no indication that Steel Fitness did not perform its obligations under the lease. The complaint notes that Steel Fitness has continued to pay rent, though directly to Defendant following the foreclosure under the assignment provisions of the mortgage. The lease relationship between Plaintiff and Steel Fitness has been disrupted because the foreclosure took Plaintiff out of the picture, not because Steel Fitness failed to perform

under the contract. Further, since Steel Fitness did not fail to perform, the purported harm to Plaintiff cannot be the result of Defendant inducing Steel Fitness not to perform.

Plaintiff tries to divert the Court from this simple conclusion by mixing and matching to meet all elements of the claim. Plaintiff's brief notes the lease but then alludes to Defendant's purported deception in stringing Plaintiff along and taking the property once Plaintiff had done the work of finding a buyer, which has nothing to do with the lease or the disparaging comments about Plaintiff's principal. Essentially, Plaintiff argues the elements are satisfied because: 1) there was an existing contract, the lease; 2) Defendant took action to harm that relationship by telling Steel Fitness they did not want to keep doing business with Plaintiff's principal and calling him a bum; 3) Defendant was not entitled to badmouth Plaintiff's principal in this way; and 4) there was damage because Plaintiff was not able to get the benefit of the purchase deal and save the property from foreclosure. But these four pieces do not go together. No damage occurred with respect to the existing contract (the lease) because the specific type of harm—Steel Fitness not performing the contract—did not result.[1] If the second element is instead understood to be satisfied by Defendant's action in foreclosing or allegedly stringing Plaintiff along is, those actions are not "specifically intended to harm the existing relation," which is the lease. *Bral Corp.*, 919 F. Supp. 2d at 612. For Count I, there is no need to become tangled up in issues such as the *res judicata* effect of the foreclosure or whether the foreclosure can constitute actionable interference if Defendant

---

[1] Plaintiff's actual briefing on the fourth element is utterly conclusory: "The fourth element necessary to support Count I is the necessity of alleging damages. In the case at bar, Riverport has alleged damages in excess of $50,000. As in all tort actions, the damages occasioned are unliquidated and continued to rise by the day. Given the pleading requirements in tort actions, paragraph 42 of Riverport's complaint [which merely states the $50,000 figure] meets the requirements of the final element . . . ."

6

was entitled to foreclose. The allegations just do not fit the framework of a tortious interference claim with respect to the lease.

### Count II: Tortious Interference with Prospective Contractual Relationship

The second count is also a tortious interference claim, but with respect to a prospective contract, specifically the alleged tentative agreement under which Steel Fitness would purchase the units it was already leasing (Units 20 and 30) and lease two additional units (Units 40 and 50). The interference cited in Count II again consists of the alleged disparaging remarks about both Plaintiff's principal and the wisdom of doing business with him, along with the allegation that Defendant told Steel Fitness that Plaintiff could not complete the transaction so Steel Fitness should wait until after the foreclosure.

The elements for this claim are the same as above, with the focus here of course on *prospective* relations: 1) a prospective contractual relation between the complainant and a third party; 2) purposeful action specifically intended to prevent a prospective relation from occurring; 3) the absence of privilege or justification; and 4) actual legal damage. *See Bral Corp.*, 919 F. Supp. 2d at 612.

A sufficient prospective contractual relation is "something less than a contractual right, something more than a mere hope." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979). There is no precise test, *see id.*, but a plaintiff "must show the prospective contract has an objectively reasonable probability of coming into existence." *Schulman v. J.P. Morgan Inv. Mgmt., Inc.*, 35 F.3d 799, 808 (3d Cir. 1994). The standard is imprecise, *see Thompson Coal*, 412 A.2d at 471, and the examples in case law do not

provide much of a consistent pattern. *See Santana Products, Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 140-41 (3d Cir. 2005) (finding no prospective contract where a construction job went to a competitor even though the plaintiff had originally convinced the potential client to specify the plaintiff's product in the project proposal); *Pellegrino Food Products Co. v. City of Warren*, 136 F. Supp. 2d 391, 408 (W.D. Pa. 2000) (finding "inquiries . . . regarding the production of different food products" sufficient even without allegations of specific dates); *InfoSAGE, Inc. v. Mellon Ventures, L.P.*, 896 A.2d 616, 628 (Pa. Super. Ct. 2006) (finding, on summary judgment, no prospective contract where the plaintiff had talked with numerous potential providers of financing and was arguably an attractive prospect but failed to show negotiations had advanced to any firm stage). Perhaps the only consistent point is that "prior or existing business relationships, standing alone, do not suffice." *Allstate Transp. Co. v. Se. Pennsylvania Transp. Auth.*, No. 971482, 1997 WL 666178, at *12 (E.D. Pa. Oct. 20, 1997), *report and recommendation adopted*, No. CIV. A. 97-1482, 1998 WL 67550 (E.D. Pa. Feb. 13, 1998); *see also TH Servs. Grp., Inc. v. Indep. Blue Cross*, No. CIV. A. 98-CV-4835, 2001 WL 115041, at *12 (E.D. Pa. Feb. 1, 2001) (finding allegations insufficient where the third party hired the plaintiff to perform an audit, after previously using a different firm, because the agreement did not contemplate future services, there was no indication the third party was conducting further audits, and the third party showed some dissatisfaction with the plaintiff's services), *aff'd*, 276 F.3d 580 (3d Cir. 2001); *Thompson Coal*, 412 A.2d at 471-72 (noting that previously renewed year-to-year lease did not create reasonable probability that the lease would extend beyond agreed cancellation date).

Ultimately, what constitutes prospective contractual relations is a case-by-case determination.

In this case, the allegations do not meet the legal standard. The existing relationship between Plaintiff and Steel Fitness is not a sufficient indication that a new deal between them would come to pass. Plaintiff alleges there was a verbal agreement with Steel Fitness to purchase the leased units and lease two additional units as of approximately January 19, 2015; this identification of a particular relationship, subject matter, and date is indeed more than is alleged in some of the cases. But the agreement as described was contingent on several uncertain factors outside the parties' control, including Steel Fitness obtaining financing from Franklin Financial. Defendant's argument that the agreement was not alleged with enough specificity to constitute an enforceable agreement is misplaced with respect to Count II because *prospective* relations are at issue; however, the indeterminacy of crucial aspects of the alleged agreement, such as price and realistic potential for financing, does reduce the reasonableness of expecting the deal to happen. Moreover, by every indication, including discussion at oral argument, a sale directly from Plaintiff to Steel Fitness could never have been completed because foreclosure was necessary to clear other issues with the title. Though this is the motion to dismiss stage, which focuses on the allegations of the complaint, the Court cannot ignore that Plaintiff, in communications with the Court, continued to talk about a possible deal with Steel Fitness in vague and shifting ways and that such a deal never really did materialize, which undermines the complaint's confident assertion that a complete agreement had been negotiated.

Under the circumstances, the allegations of the complaint are insufficient to show an objectively reasonable probability that the supposed contract between Plaintiff and Steel Fitness would come into existence. Given that the alleged prospective contract was not sufficiently likely, Plaintiff also cannot allege damage to satisfy the fourth element. Finally, there was actually nearly a year of continued negotiations between Plaintiff and Steel Fitness. This not only further reveals the extremely tentative nature of the alleged deal but also makes it implausible that Defendant's statements to Steel Fitness caused any breakdown in the relationship between Steel Fitness and Plaintiff. Count II cannot succeed.

Count III: Fraud

The third count, a fraud claim, refers generally to the alleged plan by Defendant to use Plaintiff to acquire a buyer for the property and then foreclose. Here, unlike in the other counts where it was mainly a confusing distraction, the issue is indeed the alleged agreement that Defendant would work with Plaintiff to arrange a buyer or other plan to solve the default.

The parties offer slightly different lists of elements for the fraud claim, but the lists are generally in agreement and both include a material misrepresentation, justifiable reliance on the alleged misrepresentation, and damage proximately caused by the reliance. *See Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa. Super. Ct. 2006) (citing five elements); *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) (breaking the test into six elements). Plaintiff specifically points to paragraph seventeen of the complaint as containing the representation at issue:

> At all times during the default period, Unity represented and agreed through the persons of Alan J. Bednar and Michelle S. Kirmser, Esquire, that Unity would continue to "work with" Riverport in effort to procure a new user for the space and establish and execute an acceptable "work out" plan so long as Riverport did not challenge the foreclosure and kept Unity informed of all activities associated with the attempt to re-let the units.

Plaintiff's action in reliance is not as clearly identified, but appears to be not challenging the foreclosure and keeping Defendant apprised of efforts to find a new tenant. The damage asserted is apparently that Plaintiff was not able to put together a deal and save the property.

A promise or statement of future intent, rather than a present fact, generally cannot constitute a misrepresentation for the purposes of a fraud claim. *See Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 128 (E.D. Pa. 2011); *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1054 (E.D. Pa. 1993) ("it is equally clear that a promise to do something in the future and the failure to keep that promise, is *not* fraud" (emphasis in original)); *Krause v. Great Lakes Holdings, Inc.*, 563 A.2d 1182, 1188 (Pa. Super. Ct. 1989) ("Mr. Pritzker's alleged oral statement was a promise to do something in exchange for something in return. His statement would not qualify as an act of fraud."). Matters become somewhat murky, though, when plaintiffs allege a promise was deceptive at the time it was made because the defendant never intended to follow through on it. *See Devon IT, Inc.*, 805 F. Supp. 2d at 128; *Jairett v. First Montauk Sec. Corp.*, 203 F.R.D. 181, 185 (E.D. Pa. 2001) (noting that citation to "the proposition that the breach of a

promise to do something in the future does not constitute fraud, is irrelevant here, where the object of the fraud is present intention, not future performance").

A representation must also be clear or its falsity and any reliance upon it cannot be sensibly analyzed. *See Krause*, 563 A.2d at 1190 ("[T]he written agreement [the source of the alleged misrepresentation] is ambiguous as to the responsibility of GL for PPC's installment note obligation. Therefore, the basic premise of Count V, that the Debtor group represented that it would be responsible for PPC's obligation, is not established at this point.").

The misrepresentation alleged here—that Defendant would work with Plaintiff in exchange for Plaintiff not challenging foreclosure and sharing information about potential workout arrangements—is in the nature of a promise and is the entire substance of the agreement Plaintiff alleges rather than some collateral aspect. In addition, it is vague and open-ended to the point that one cannot even say whether the representation was false. What did "working with" Plaintiff entail such that the question of whether Defendant did so could be resolved? How long was this indeterminate cooperation to continue? By alleging a misrepresentation in the form of a vague promise to do something in the future, Plaintiff cannot make out the most basic element of a fraud claim.

Even if the Court were to conclude there was a misrepresentation, the representation's vagueness could mean that reliance on it was not justifiable. *See Jordan-Milton Mach., Inc. v. F/V Teresa Marie, II*, 978 F.2d 32, 37 (1st Cir. 1992) ("It would have been unreasonable for Odlin, in such circumstances, to construe Peacock's puffery about 'doing the deal' as concrete information . . . . There could have been no 'justifiable reliance' on the vague exhortation provided."); *Glob. Integrated Bldg. Sys. v. Target*

*Logistics, LLC*, No. CIV A H-06-2637, 2009 WL 259360, at *8 (S.D. Tex. Feb. 3, 2009) ("In proving justifiable reliance in a claim for fraud or promissory estoppel, the alleged representation relied upon cannot be vague and indefinite."); *Bureau v. Gendron*, No. CIV. A. CV-00-03, 2001 WL 1671462, at *3 (Me. Super. Mar. 21, 2001) (an unspecific promise to "'help' with the rent if the construction caused problems . . . is not sufficiently clear, nor may such a vague assertion form the basis for justifiable reliance"), *vacated*, 783 A.2d 643.

Reliance on an oral representation also may not be justifiable when there are statutory or contractual requirements that the subject of the representation must be in writing. *See United States v. Zorger*, 407 F. Supp. 25, 28 (W.D. Pa.) (noting the statute of frauds and a deed clause requiring written permission to build on a tract as among the reasons that relying on oral approval to build was not justifiable, though in an estoppel analysis rather than a fraud claim), *aff'd*, 546 F.2d 421 (3d Cir. 1976). *But see Josephs v. Pizza Hut of Am., Inc.*, 733 F. Supp. 222, 225-26 (W.D. Pa. 1989) (explaining that the statute of frauds allows reliance damages based on promissory estoppel and that actual fraud might make available full benefit-of-the-bargain despite the statute of frauds), *aff'd*, 899 F.2d 1217 (3d Cir. 1990); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 151 N.E.2d 833, 836 (N.Y. 1958) (rejecting idea that statute of frauds precludes justifiable reliance on a representation that would violate it because the action does not sound in contract and the statute of frauds should not protect fraudulent conduct). An integrated contract will bar justifiable reliance based at least on prior representations covered by the integration. *See Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F. Supp. 2d 644, 657 (W.D. Pa. 1999) ("In order to assert a claim for either fraud or negligent

misrepresentation, the plaintiff must show justifiable reliance on the allegedly untrue statement or omission. . . . As a matter of basic logic, [the plaintiff] simply cannot be said to have relied upon representations specifically excluded by the integration clause.").

The emptiness of Plaintiff's argument on justifiable reliance is telling. Plaintiff's entire discussion of the issue reads: "Justifiable reliance upon the representations is the next element required to be pleaded. In the case a bar, Riverport certainly alleged reliance and the justifiable nature of that reliance can certainly be inferred from the totality of the circumstances as pleaded." Rarely has it been more true that confident-seeming words such as "certainly" actually draw attention to gaps in reasoning. The "totality of the circumstances" here includes sophisticated business entities, multiple written forbearance agreements with expirations and integration clauses, a vague and open-ended oral promise, and the fact that the subject matter is an interest in land that implicates the statute of frauds. Under these circumstances, Plaintiff simply could not be justified in relying on Defendant's alleged representation.

"[P]roximate cause is an essential element of . . . fraudulent misrepresentation . . . claims." *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009). "The court must ascertain whether a defendant's acts or omissions were a 'substantial factor' in bringing about the plaintiff's harm." *Id.* Most cases discussing this element note that the misrepresentation need not be the only factor and address how to assess whether it is a *substantial* factor. *See, e.g., id.* (applying the analysis of Restatement (Second) of Torts § 433, which deals with the number of contributing factors, the extent of each factor's effect, and the continuity of those effects leading up to the harm).

In this case, even crediting the allegations of the complaint, Plaintiff's reliance on the misrepresentation was not really a factor in the harm suffered at all. Plaintiff cites as its reliance the fact that it did not challenge the foreclosure, but it is apparent that Plaintiff could not have raised any challenge to the foreclosure. Plaintiff was clearly in default, a fact admitted in the forbearance agreements and in the complaint, and there is no indication that any defenses would have been available. Further, even assuming Plaintiff could have somehow countered the foreclosure, the foreclosure was far from a substantial factor, if it was a factor at all, in the failure of the deal with Steel Fitness. From the complaint's own description, the deal failed because Steel Fitness did not obtain financing arrangements. In fact, as noted above, the foreclosure was apparently necessary to clear title, so it might actually have *increased* the possibility of getting financing and making the deal work. Plaintiff also suggests that part of its reliance took the form of sharing information on potential workout deals with Defendant, which allegedly somehow allowed Defendant to hijack the deal to its own benefit. But the parties indicated to the Court that Plaintiff was still working on a deal with Steel Fitness (ultimately unsuccessfully) well into the pendency of this action, which demonstrates both that Defendant did not swoop in and do its own deal with Steel Fitness, and that no complained-of action by Defendant actually stopped Steel Fitness from trying to work out an arrangement with Plaintiff.

Given these issues with the misrepresentation itself, the justifiability of Plaintiff's reliance, and the causal connection between that reliance and the harm alleged, Plaintiff clearly cannot make out a claim for fraud.

Conclusion

Plaintiff's allegations, even if they may paint a picture of potential wrongdoing that makes some abstract sense from a certain perspective, simply do not match up with the tortious interference and fraud causes of action alleged in the complaint. Having held oral argument and further heard from the parties in conferences throughout the pendency of this case, the Court is confident that these mismatched facts and causes of action cannot be solved by amendment; therefore, the complaint will be dismissed with prejudice by an accompanying order.